

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA
FOR A WARRANT AUTHORIZING THE
INSTALLATION AND MONITORING OF
A TRACKING DEVICE IN OR ON A 2-DOOR 2005
CHEVORLET COBALT, ORANGE IN COLOR
BEARING OHIO LICENSE PLATE NUMBER
FSY-8551, VEHICLE IDENTIFICATION
NUMBER 1G1AL12F957623479

MICHAEL R. HERZ
UNITED STATES
MAGISTRATE JUDGE

<u>AFFIDAVIT</u>

I, Todd H. Burkart, Special Agent, Federal Bureau of Investigation ("Affiant"), being

duly sworn, herby depose and say:

## INTRODUCTION

1.      I am a Special Agent with the United States Department of Justice, Federal

Bureau of Investigation ("FBI").

2.      I have been employed as a Special Agent with the FBI since 2004 and am

currently assigned to the FBI resident office in Dayton, Ohio.  Prior to my employment with the

FBI, I was employed as a Special Agent with the Drug Enforcement Administration ("DEA")

from 1999 to 2004.  During my time as a law enforcement officer, I have participated in

numerous investigations that have resulted in the execution of Federal search warrants and arrest

warrants; the seizure of firearms, narcotics, and related contraband; as well the seizure of

proceeds directly related to the violation of Federal laws.  In connection with my official duties

as a Special Agent, I currently investigate violations of federal criminal laws, including offenses

involving wire and mail fraud, public corruption, and money laundering.

3.      The facts in this Affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses, including from the Ohio

1

Organized Crime Investigative ("OOCIC") Task Force and other law enforcement officers involved in this investigation. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PURPOSE OF AFFIDAVIT

4.      This affidavit is in support of a warrant authorizing the installation and use of a GPS tracking device on a vehicle driven by WILLIS E. BLACKSHEAR SR ("BLACKSHEAR"), described as an orange 2-door 2005 Chevrolet Cobalt (according to open source databases, Chevrolet replaced the Cavalier with the Cobalt in 2005), further identified by VIN 1G1AL12F957623479 and Ohio License Plate FSY-8551 ("**SUBJECT VEHICLE**"). The **SUBJECT VEHICLE** was initially believed to be a Chevrolet Cavalier and later determined to be a Chevrolet Cobalt. Subsequent references to a "Cavalier" in this Affidavit are referring to the **SUBJECT VEHICLE**. According to the Ohio Law Enforcement Gateway ("OHLEG") database, the only orange Chevrolet currently registered to BLACKSHEAR is the **SUBJECT VEHICLE**. Based on our investigation to date (as detailed below), I believe there is probable cause to believe that the **SUBJECT VEHICLE** driven by BLACKSHEAR is presently being used in furtherance of violations of federal law, including bribery concerning programs receiving Federal funds, in violation of 18 U.S.C. § 666.

5.      Affiant further states that there is probable cause to believe that the installation of a tracking device in or on the **SUBJECT VEHICLE**, and use of the tracking device, will lead to evidence of a crime, contraband, fruits of crime and instrumentalities of the aforementioned crimes as well as to the identification of additional individuals who are engaged in the commission of those related crimes.

2

## FACTS ESTABLISHING PROBABLE CAUSE

6.     In January 2013, the FBI opened an investigation based in part on allegations that STEVE RAUCH ("RAUCH"), owner of STEVER RAUCH INCORPORATED ("SRI"), a Dayton-based demolition company, bribed state and local politicians in exchange for federally funded demolition contracts in and around the City of Dayton.

7.     In April 2013, a former SRI Project Manager (hereafter referred to as Confidential Human Source One "CHS-1") was interviewed. CHS-1 stated that former Dayton Mayor RHINE MCLIN ("MCLIN") and RAUCH had a "tight" relationship and CHS-1 often heard jokes about them being "together." CHS-1 saw pictures of RAUCH and MCLIN together in RAUCH'S office as well as gifts from MCLIN. RAUCH often threatened to "call the Mayor" when he faced issues on Dayton projects. CHS-1 also heard RAUCH state, "I'm going to call the Mayor" on multiple occasions when RAUCH thought SRI wasn't the lowest bidder and therefore unlikely to get a demolition contract. CHS-1 recalled a City of Dayton federally funded demolition contract in excess of $1 million issued to one of SRI's competitors. RAUCH told CHS-1 the competitor had the lowest bid, but failed to meet the city of Dayton's minority subcontractor requirement. The City of Dayton subsequently reassigned the contract to SRI, which CHS-1 suspected occurred because of RAUCH'S relationship with MCLIN rather than the minority subcontractor requirement.

8.     In July 2013, a former project estimator and manager (hereinafter referred to a Confidential Human Source Two "CHS-2") of a now defunct demolition company that directly competed with SRI was interviewed. CHS-2 stated that he began bidding on federally funded demolition projects from the City of Dayton in approximately 2009. At the time, SRI did the majority of demolition work for Dayton and it was "very hard to compete" with them in the

3

bidding process. CHS-2 heard then Dayton Mayor RHINE MCCLIN was RAUCH'S girlfriend at the time. CHS-2 suspected MCCLIN used her influence to ensure RAUCH obtained federally funded demolition contracts because SRI won virtually all bids.

9.      In August 2013, a second former SRI Project Manager (hereafter referred to as Confidential Human Source Three "CHS-3") recorded a meeting with DAN FEUCHT ("FEUCHT"), SRI's current controller. During their conversation, FEUCHT stated RAUCH gave MCLIN a "shit ton" of money while she was the Mayor of Dayton. FEUCHT continued that MCLIN used an individual (later identified by FEUCHT as two individuals with one being the current Montgomery County Recorder, WILLIS BLACKSHEAR SR) to pick up the money at SRI's headquarters once every few weeks, "so she [MCLIN] didn't have to ever touch it." While MCLIN was mayor, FEUCHT estimated that RAUCH gave her $100,000 a year. FEUCHT recalled specific occasions when RAUCH would order him to leave money out for MCLIN as follows: "Steve would say, and you know, we need to get $10,000 in cash. So we would get the money, put it in the envelope, seal the envelope, and put it on the front counter. Steve . . . front counter? You know this was at like 5:30 at night. You sure? And he goes, when the door makes the noise. . . or . . . you know, you hear the bell...we used to have a bell on the front door, and he goes, when you . . . when you hear the bell, he goes, let it go."

10.     In September 2013, CHS-3 placed an outgoing recorded telephone call to FEUCHT. During a pertinent portion of the conversation, CHS-3 asked FEUCHT to name of the individual who used to come to SRI and get money for MCLIN. FEUCHT reported that there were two individuals, and identified one of them as BLACKSHEAR (the current Montgomery County Recorder). FEUCHT continued that MCLIN used BLACKSHEAR to pick up her money because he was not directly related to her office and, "she couldn't come in herself." FEUCHT

4

stated that BLACKSHEAR still comes into SRI's headquarters and "Steve still pays his campaign and gives him a little money."

11.     On September 21, 2013, the OOCIC Task Force conducted surveillance at the Town and County Shopping Center, Kettering, Ohio.  The surveillance was based on CHS-3 information that RAUCH was hosting an annual party and attending guests would park at the Town and County Shopping Center before being bused to his residence.  For approximately two hours, agents photographed vehicles and individuals who arrived and were believed to be attending the party.  Upon reviewing the photographs, agents observed the **SUBJECT VEHICLE** parked in the lot (see attached photograph).

12.     In October 2013, CHS-3 placed an outgoing recorded telephone call to FEUCHT. During a pertinent portion of the conversation, the CHS stated he/she was driving and observed BLACKSHEAR driving an "orange Cavalier."  FEUCHT responded, "Yeah, yeah that's what he drives dude."  CHS-3 then asked FEUCHT if that is what BLACKSHEAR drives to get his "little pay-offs."  FEUCHT responded, " Uh-ha . . . that's what he drives up here.  Yeah, you're exactly right."  Later  in the conversation, FEUCHT stated, "What he [BLACKSHEAR] does is he acts as the intermediary, so NAN (current City of Dayton Commissioner and Mayor Candidate NAN WHALEY) doesn't have to come out here.  You know, the City of Dayton Commission doesn't have to come out here.  So he [BLACKSHEAR] does all the running.  He [BLACKSHEAR] comes out here and collects all the money."  Later CHS-3 asked if "even NAN WHALEY is in on that deal?"  FEUCHT responded, "Oh yeah.  Very much so."  Later FEUCHT continued, "He [BLACKSHEAR] comes in here in his little orange Cavalier and he [BLACKSHEAR] takes the money to go to her [NAN WHALEY]."

13.    In May and July 2013, United States Magistrate Judge Sharon L. Ovington and United States Magistrate Judge Michael R. Merz signed separate orders authorizing the FBI to install and monitor a pen register for a cellular phone subscribed to and believed to be used by RAUCH. An analysis of pen register data has revealed that the RAUCH's cellular phone had approximately 5 contacts with (937) 416-7953, approximately 2 contacts with (937) 263-5618, and approximately 15 contacts with (937) 222-7978, between June 3, 2013 and August 9, 2013. A review of Dayton Police Department MIS Database revealed that BLACKSHEAR filed a property damage report on October 12, 2011. The report lists BLACKSHEAR's daytime telephone number as (937) 416-7953, home phone number as (937) 263-5618, and work number as (937) 222-7978.

14.    Based upon the information above, Affiant believes that there is probable cause to believe that BLACKSHEAR is using the **SUBJECT VEHICLE** described above to pick-up and deliver bribe payments from RAUCH to one or more current and former City of Dayton officials, including members of the City of Dayton Commission, in violation of federal law. As such, the use of a mobile tracking device would allow investigators to track the movement of the **SUBJECT VEHICLE** which may provide evidence of his travel, places where meets with individuals believed to receiving bribes from RAUCH, as well as potential other co-conspirators.

15.    In order to track the movement of the **SUBJECT VEHICLE** effectively and to decrease the chance of detection, Affiant seeks to place a mobile tracking device in or on the **SUBJECT VEHICLE** while it is in the Southern District of Ohio. Because BLACKSHEAR parks the **SUBJECT VEHICLE** in his driveway and potentially on other private property, it may be necessary to enter onto private property in order to effect the installation, repair, replacement, and removal of the tracking device. To ensure the safety of the executing officer(s)

and to avoid premature disclosure of the investigation, it is requested that the court authorize installation and removal of the tracking device during both daytime and nighttime hours. The installation of the vehicle during daytime visibility may compromise the investigation.

16.     In the event that the Court grants this application, there will be periodic monitoring of the tracking device during both daytime and nighttime hours for a period of forty-five (45) days following the issuance of the requested warrant. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

17.     It is requested that the warrant and accompanying affidavit and application in support thereof, as they reveal an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, and better ensure the safety of agents and others, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents and other investigative and law enforcement officers of OOCIC, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.

18.     In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I request that the warrant delay notification of the execution of the warrant for a period not to exceed 30 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification would seriously jeopardize the investigation.

WHEREFORE, your Affiant respectively requests that the Court issue a warrant authorizing members of the FBI and OOCIC Task Force or their authorized representatives,

including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install a tracking device in or on the **SUBJECT VEHICLE** within the Southern District of Ohio within 10 calendar days of the issuance of the requested warrant, and to remove said tracking device from the **SUBJECT VEHICLE** after the use of the tracking device has ended; to enter private property to effect the installation, repair, replacement, and removal of the tracking device; and to monitor the tracking device, for a period of 45 days following the issuance of the requested warrant, including when the tracking device is inside private garages and other locations not open to the public or visual surveillance, both within and outside the Southern District of Ohio.

Todd H. Burkart
FBI Special Agent

Sworn to before me this 22nd day of October, 2013

Honorable Michael R. Merz
United States Magistrate Judge

8

